UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES A. BAILEY,

                    Plaintiff,           Case No.: 2:04-CV-74092

                                   HON. NANCY G. EDMUNDS
vs.                              MAG. JUDGE WALLACE CAPEL, JR.

FORD MOTOR COMPANY,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

       Before the Court are Plaintiff James Bailey's Motion to Reverse ERISA Administrative Decision and Defendant Ford Motor Company's Amended Motion to Affirm ERISA Administrative Decision.[1]  The issue is whether or not Defendant acted wrongfully when it did not pay out a lump sum retirement benefit to Plaintiff pursuant to its 2002 Salaried Window Program.

## II.    STANDARD OF REVIEW

       A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-957 (1989); Hunter v. Caliber System, Inc., 220 F.3d 702, 710 (6th Cir. 2000).  Application of the highly deferential arbitrary and capricious

---

      [1]Pl.'s Mot. to Reverse ERISA Administrative Decision (November 10, 2005), Def.'s Amended Mot. to Affirm ERISA Administrative Decision (November 7, 2005).

standard of review is appropriate when the benefit plan gives the fiduciary or administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston, 419 F.3d 501, 506 (2005) (citations omitted).

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000). If an administrator's decision on eligibility for benefits is "rational in light of the plan's provisions," it is not arbitrary or capricious. Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988) (citation omitted), cert. denied, 488 U.S. 826, 109 S. Ct. 76 (1988). When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. Williams, 227 F.3d at 712. Furthermore, where there are two reasonable interpretations of the Plan, the Court cannot reverse the administrator's determination. Anderson v. Emerson Elec. Co., 351 F. Supp. 2d 740, 743-44 (W.D. Mich. 2004) (citations omitted), aff'd Anderson v. Emerson Electric Co., No. 05-1036, 161 Fed. Appx. 504, 2005 Fed. App. 1012N (6th Cir. Dec 23, 2005).

However, the highly deferential standard of review does not automatically mandate adherence to [the administrator's] decision. McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).

> [T]he court has an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence - no matter how obscure or untrustworthy - to support a denial of a claim for ERISA benefits.

2

Id. (citations omitted).

When a district court is reviewing a plan administrator's denial of benefits, the court may only consider those materials that were available to the plan administrator when it made its final decision. Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health & Welfare Trust, 203 F.3d 926, 932 (6th Cir. 2000) (citations omitted). In interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of is language, as it would be construed by an ordinary person. Id. at 934 (citation omitted).

## III.   **FACTS**

Plaintiff was employed by Defendant Ford Motor Company for more than thirty-five years. While working for Defendant as a General Supervisor of Technology Control and Maintenance, Plaintiff was offered a 2002 Salaried Window Program package ("the Plan"), on May 21, 2002.[2] Plaintiff had forty-five days to accept the Plan, which permitted eligible employees to accept an early retirement opportunity. The Plan also provided certain separation benefits for qualifying employees who would choose to leave their employment by certain dates in 2002. The Plan required completion of Waiver and Release and notification of acceptance to management within forty-five days of the initial offer and after the forty-five day period, there was a seven day reconsideration period.[3]  The Plan also required separation from employment on or before July 31, 2002 (unless a later date in 2002 was justified for business reasons and a timing exception was granted by the Vice

---

[2]Pl.'s Brief in Support of Mot. to Reverse ERISA Administrative Decision 3 (November 10, 2005) [hereinafter Pl.'s Brief]; Def.'s Amended Brief in Support of Mot. to Affirm ERISA Administrative Decision 5 (November 7, 2005) [hereinafter Def.'s Brief].

[3]Def.'s Administrative Record of James Bailey 5 (October 13, 2005) [hereinafter Def.'s Admin. Record].

President of Human Resources).[4]

Almost one year prior to Plaintiff's retirement, in June 2001, Defendant released a policy to all of its employees,[5] and part of that policy was a "freeze" on all new phone, pager, Palm Pilot, Blackberry, and laptop purchases.[6]  In February 2002, an Inter Office memorandum was released to all employees, which stated that discretionary spending was not permitted for any items if those items were not related to health and safety, the quality of Defendant's products, achievement of Defendant's production/sales goals, or delivery of Defendant's agreed Cycle Plan.[7]

Plaintiff accepted the 2002 Salaried Window Program package ("the Plan") on July 5, 2002, choosing the Regular Retirement with Lump Sum Option.[8]

On June 17, 2002, Defendant's Executive Operations Department received a "Tip Line" call from Scott Rodesiler, the Director of Circuit City Stores in Ann Arbor, Michigan.[9]  Mr. Rodesiler called to inform Defendant that he suspected Plaintiff was engaging in unauthorized use of his Ford Corporate Credit Card on June 11, 2002.[10]  Mr. Rodesiler explained that Plaintiff bought several electronics (a wireless phone, a personal digital assistant ("PDA"), and two sub-woofers, the total

---

[4]Id.

[5]Def's Admin. Record 32-34.

[6]Def.'s Admin. Record 34.

[7]Def.'s Admin. Record 28-31.

[8]Pl.'s Brief 2, Def.'s Brief 6 n.3, Def.'s Admin. Record 54.

[9]Def.'s Admin. Record 20-24.

[10]Def. Admin. Record 22.

4

cost of which exceeded $1750) using his Ford Corporate Credit Card.[11]  However, before Plaintiff ever had physical possession of the electronics, he returned them.[12]  Plaintiff returned the mobile phone and PDA minutes later on the same day of purchase, whereas he canceled the order for subwoofers six days later.[13]  When a Circuit City employee asked Plaintiff why he made these purchases and then returned them, he told the employee "not to worry" and that "the store would still get its money."[14]

Based on this tip, Defendant began an investigation and on July 19, 2002, interviewed Plaintiff regarding the purchases from Circuit City on June 11, 2002.[15]  During the interview and in a written statement, Mr. Bailey stated that these purchases were charged to his corporate card by mistake and that no items were taken from the store.[16]  Plaintiff stated that he was trying to put the items on hold and that his credit card was accidentally charged.[17]  Plaintiff's corporate card was canceled immediately after the interview on July 19, 2002, to ensure that he could make no additional charges.[18]

On July 29, 2002, two days before Plaintiff retired, Philip Lussier, an Office Operations

---

[11]Def.'s Admin. Record 22.

[12]Id.

[13]Id.

[14]Id.

[15]Id.

[16]Def.'s Admin. Record 22, 97.

[17]Id.

[18]Def.'s Admin. Record 111.

Manager, noted that several questionable suppliers were used with Plaintiff's card.[19]  On July 31, 2002, Plaintiff retired.[20]   The investigation into Plaintiff's questionable purchasing practices continued,[21] and by August 20, 2002, Deborah Morgeson, Human Resources Supervisor, had collected a significant amount of information about suspect purchases made to Plaintiff's corporate credit card.[22]  The suspect purchases included: a Sony Clié PDA ($635.99) and a Palm m500 Slim Leather Case, purchased on June 14, 2002 ($26.49),[23] as well a Palm m130 PDA ($296.78) and a Palm Flip Case ($15.88), purchased on June 20, 2002.[24]  Andy Romanczuk, a Maintenance Follow-Up Clerk, stated in an interview that he was instructed by Plaintiff to make these purchases with the department card issued under Plaintiff's name, and that Plaintiff signed off on these purchases.[25]

Ms. Morgeson contacted the Pension Department to request a stop payment on Plaintiff's lump sum retirement payment until an investigation into the missing items was completed, and this request was approved.[26]

Wesley Westberg, a Maintenance Supervisor who reported to Plaintiff before Plaintiff's retirement, stated in an interview that Plaintiff contacted him at some time during the week of

---

[19]Def.'s Admin. Record 113.

[20]Def.'s Brief 6.

[21]Def.'s Admin. Record 113-124 (emails between human resources personnel and investigators).

[22]Def.'s Admin. Record. 41.

[23]Id.

[24]Def.'s Admin. Record 38.

[25]Def.'s Admin. Record 136-137.

[26]Def.'s Admin. Record 121.

6

August 12, 2002.[27]  According to Mr. Westberg, Plaintiff instructed him to look in the storage area

above the Maintenance Office and to retrieve a small package located on top of a file cabinet and

underneath a box.[28]  Plaintiff then asked Mr. Westberg to place the package in Mr. Westberg's desk

until Plaintiff called again to give further instructions.[29]  After several weeks had elapsed and

Plaintiff had not called back, Mr. Westberg turned the package over to Pat Fitzgerald, Outbound

Warehouse and Maintenance Manager, and they opened it together.[30]  The package contained the

Sony Clié PDA purchased on June 14, 2002.[31]

On August 21, 2002, Larry Allen, National Parts Distribution Center Manager, left a message

for Plaintiff to call to discuss missing purchases, but Mr. Allen did not receive a return phone call

from Plaintiff.[32]  Ms. Morgeson also called Plaintiff on September 9, 2002, but she did not receive

a return phone call from Plaintiff either.[33]  On October 9, 2002, Ms, Morgeson sent a registered letter

to Plaintiff indicating that a stop payment had been placed on his lump sum retirement payment until

an investigation into the missing purchases was completed.[34]  A meeting was scheduled for October

---

[27]Def.'s Admin. Record 138.

[28]Id.

[29]Def.'s Admin. Record 139.

[30]Id.

[31]Id.

[32]Def.'s Admin. Record 132.

[33]Id.

[34]Id.

22, 2002, to address the issue.[35]  On October 14, 2002, according to Mr. Westberg, Plaintiff made another call to him, and Mr. Westberg told Plaintiff that he had given the PDA to Mr. Fitzgerald.[36] On October 22, 2002, Mr. Bailey called to cancel his appointment and indicated that he would be available in two weeks.[37]

On October 31, 2002, Plaintiff was interviewed again for the purpose of investigating his missing purchases.[38]  During this interview, Plaintiff stated that he did have Mr. Romanczuk purchase the Sony Clié and case for him but that he never used the Sony Clié, because he "couldn't use it."[39]  He admitted that he purchased the Sony Clié without authorization and that he should have returned it for a refund rather than putting it the storage area.[40]  Plaintiff denied knowledge of the whereabouts of the Palm m130 and Palm Flip Case, and then located the leather case for the Sony Clié with a security escort in the storage area above the Maintenance Office.[41]

Plaintiff was subsequently denied his lump sum retirement benefit, and on December 3, 2002, he was retroactively terminated, effective his last day worked (July 31, 2002), for breach of trust, lack of integrity, and suspected theft.[42]

---

[35]Id.

[36]Def.'s Admin. Record 138.

[37]Def.'s Admin. Record 141.

[38]Def.'s Admin. Record 134-35.

[39]Def.'s Admin. Record 134.

[40]Def.'s Admin. Record 134-135.

[41]Id.

[42]Def.'s Admin. Record 140-142.

IV.   **ANALYSIS**

_____The issue before the Court is whether or not Defendant acted wrongfully when it did not pay

out a lump sum retirement benefit to Plaintiff pursuant to the 2002 Salaried Window Program.

This Court agrees with Plaintiff that the section of the Plan entitled "Other Window Benefits"

does not apply to the Plan in its entirety.  Therefore, the language therein contained ("As with any

Company benefit, these programs may be changed, suspended, or terminated . . ."[43]) is irrelevant to

the case at bar, and does not require application of the arbitrary and capricious standard.

However, Plaintiff concedes that the Plan in this case gives the Plan administrator

discretionary authority to determine eligibility for benefits and to construe the terms of the plan.[44]

In a section entitled "Program Eligibility," the Plan provided that:

> You are eligible for the 2002 Window if you met all of the following requirements:
> • You are selected by your management to be offered the Window opportunity;
> • You are a full time active U.S. employee in Salary Grade 1-8 or Leadership Level 6;
> • You are at least age 50 with 10 or more years of credited pension service, or age 65 or older with one or more years of credited service as of your last day of employment; and
> • You are an employee in good standing as of the last day of your employment. The Company retains the right to determine whether to offer the 2002 Window to any particular employee.[45]

The last page of the Plan also expressly provides that "[t]he Company reserves the right to change,

suspend, or terminate any Plan or program at any time."[46]  Giving this language its plain meaning

---

[43]Def.'s Admin. Record 10.

[44]Pl.'s Brief 5.

[45]Def.'s Admin. Record 5-6 (emphasis added).

[46]Def.'s Admin. Record 18.

and considering its position at the end of the document, it is clear that Defendant reserved to itself discretionary authority to determine eligibility for the Plan and to construe its terms.  Therefore, pursuant to the case law stated above, this Court will apply the arbitrary and capricious standard to the case before it.

The express language of the Plan provided that good standing as of the last day of the Plaintiff's employment was an eligibility requirement for the Plan, and Defendant retained the right to determine eligibility.  Under Shelby County Health Care Corp., 203 F.3d at 934, Defendant was required to adhere to the plain meaning of the Plan's language, as it would be construed by an ordinary person.  The dictionary definition of "standing" is "position or condition in society or in a profession; *esp*: *good reputation* (emphasis added)."  Merriam-Webster Collegiate Dictionary 1146 (Frederick C. Mish, et al., ed., Merriam-Webster, Inc., 1998) (1831).  At the time of his separation from employment, Plaintiff was under investigation for several unauthorized purchases; in June 2002, Plaintiff made unauthorized purchases exceeding $700, not including those purchases made and subsequently returned.  An ordinary person reading the good standing eligibility requirement would undoubtedly conclude that an employee who is under investigation by his employer for a breach of fiduciary duty is not "in good standing."  Furthermore, it would be rational in light of the Plan's provisions to reach such a conclusion.

The evidence upon which Defendant relied in making its administrative decision is the result of a thorough investigation, which offered repeated opportunities for Plaintiff to give explanations for his unauthorized purchases.  However, the ledgers of Plaintiff's corporate credit card statements, as well as the statements of his co-workers, reflect unauthorized purchases that were most likely for personal use, in violation of company policy and simple ethics.

10

Plaintiff has argued that his retroactive termination was flawed and biased.[47] The Court notes that, although Defendant asserted that retroactive termination is a "well-established" employment practice, it cited no relevant authority (factual or legal) to support this contention. However, the Court's inquiry is limited to determining whether or not Defendant's decision to refuse to pay out lump sum retirement benefits to Plaintiff was arbitrary or capricious. The question of Plaintiff's termination from employment is entirely separate to the question of denial of benefits. Defendant could have refused to pay Plaintiff the lump sum retirement benefit on the basis of the good standing eligibility requirement, without retroactively terminating him.

Additionally, even if the Court assumes, *arguendo*, that Plaintiff's argument (that the good standing requirement would not preclude payment of the lump sum retirement benefit) is reasonable, the determination does not change. Where there are two reasonable interpretations of the Plan, the Court cannot reverse the administrator's determination. <u>Anderson</u>, 351 F. Supp. 2d at 743-44.

## V.   <u>CONCLUSION</u>

For these reasons, the undersigned respectfully recommends that Plaintiff's Motion to Reverse ERISA Administrative Decision is **DENIED** and that Defendant's Motion to Affirm ERISA Administrative Decision is **GRANTED**.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of the further right of appeal to the United States Court of Appeals. <u>United States v. Walters</u>, 638 F.2d 947 (6th. Cir.

---

[47]Pl.'s Mot. to Reverse ERISA Administrative Decision (i).

11

1981).  In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may

enlarge the period of time in which to file objections to this report.


                              s/Wallace Capel, Jr.
                              **WALLACE CAPEL, JR.**
                              **UNITED STATES MAGISTRATE JUDGE**


**Dated**:   August 10, 2006

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>August 10, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Rick A. Haberman, Maurice G. Jenkins, Sherry D. O'Neal, and Frederick M. Toca,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Lisa S. Goodman, Dickinson Wright, 500 Woodward Avenue, Suite 4000, Detroit, Michigan 48226-3425</u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

13